IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO

IN RE:

ALCO CORPORATION

XXX-XX4986

Debtor

CASE NO. 12-00139 MCF

Chapter 11

FILED & ENTERED ON 03/11/2013

## OPINION AND ORDER

Before this Court is the confirmation of Alco Corporation's (hereafter referred to as "Debtor") Amended Chapter 11 Plan of Reorganization and Objection to Confirmation and Request for Conversion filed by Betteroads Asphalt Corporation, Petroleum and Emulsion Manufacturing Corporation and Betterecycling Corporation (hereafter jointly referred to as "Betteroads Group") (Docket No. 160, 247 and 248). For the reasons set forth herein, this Court confirms Debtor's Amended Chapter 11 Plan of Reorganization, overrules Betteroads Group's objection, and denies Betteroads Group's request for conversion to Chapter 7.

1

## I- Procedural History

Debtor is a corporation organized under the laws of the Commonwealth of Puerto Rico, whose primary business is the production and sale of asphalt (Docket No. 44). Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 12, 2012, in order to protect its assets from the effects of ongoing litigation with secured creditors and suppliers (Docket No. 1 & 44). Betteroads Group are Debtor's creditors and competitors in the sale of asphalt in Puerto Rico.

Debtor filed an Amended Disclosure Statement and Amended Chapter 11 Plan of Reorganization (the "Amended Plan") (Dockets No. 159 & 160). The Betteroads Group filed a Limited Objection to the Amended Plan (Docket No. 247) and an Amended Objection to Confirmation of the Amended Plan and Request for Conversion to Chapter 7 liquidation (Docket No. 248).[1] The Betteroads Group voted to reject the Amended Plan.[2]

During the course of a three day evidentiary hearing, the Court heard testimony from Debtor's President, Alfonso Rodriguez ("Rodriguez"), Debtor's Certified Public Accountant, Certified Evaluation Analyst and Certified Financial Government Manager, Jose

---

[1] At the hearing held on December 18, 2012, the Court determined that Betteroads Group's Amended Objections were timely filed (Docket No. 284).
[2] The Betteroads Group is included in the Amended Plan under Class 12 as Other General Unsecured Claims. The total amount of claims in Class 12 is $5,812,066. The Betteroads Group's total claims comprises 51% of the total value of the claims in Class 12; hence, they control Class 12.

J. Jimenez Vazquez ("Jimenez"), Betteroads Group's expert witness, a certified public accountant, Luis R. Carrasquillo Ruiz ("Carrasquillo"), and Antonio J. Diaz ("Diaz"), an engineer and Vice President of Sales and Engineering for Betteroads.

## II - Jurisdiction

The Court has jurisdiction to hear this case, pursuant to 28 U.S.C. § 157(a)[3] and the general order of the United States District Court dated July 19, 1984, which refers title 11 proceedings to the Bankruptcy Court (Torruellas, C.J.). This is a core proceeding, pursuant to 28 U.S.C. § 157(b).

## III - Legal Analysis

The statutory requirements for the confirmation of a Chapter 11 plan can be found in § 1129 of the Bankruptcy Code. The plan proponent bears the burden of demonstrating by preponderance of the evidence that each element of § 1129 has been met.[4] Upon agreement of the parties, the only contested issue is whether the Amended Plan meets the feasibility requirements pursuant to § 1129(a)(11).[5]

A Chapter 11 plan cannot be confirmed if such confirmation will likely be followed by the liquidation or the need for further financial reorganization of the debtor, unless such liquidation is

---

[3] Unless otherwise indicated, all statutory references are to title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 (the "Bankruptcy Code").

[4] Beal Bank, S.S.B. v. Waters Edge Ltd. Partnership, 248 B.R. 668, 690 (D. Mass. 2000).

part of the plan, pursuant to § 1129(a)(11). This is commonly referred to as the "feasibility test." "In determining whether [a plan of reorganization] is feasible, the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable."[6] The purpose of § 1129(a)(11) is manifold:

> 1) 'to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan that the debtor can possibly attain after confirmation,' In re Pikes Peak Water Company, 779 F.2d 1456, 1460 (10th Cir. 1985), quoting In re Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985) and L. King, 5 Collier on Bankruptcy para. 1129.02 [11] (15th ed. 1984); 2) to prevent an abuse of the reorganization process by the confirmation of a plan of a debtor likely to return to bankruptcy, In re Prudential Energy Co., 58 B.R. at 862; and 3) to promote the willingness of those who deal with post-confirmation debtors to extend the credit that such companies frequently need. [7]

The Betteroads Group asserts that the financial information submitted with the Amended Plan lacks credible assumptions and the Plan is not feasible. The Betteroads Group' objections can be grouped into three categories: (a) Debtor's pre-petition historical performance, (b) post-petition performance and (c) post-

---

[5] See Transcript February 18, 2013, p.195.
[6] In re Monnier Brothers, 755 F.2d 1336, 1341 (8th Cir. 1985)(quoting United Properties, Inc. v. Emporium Department Stores, Inc., 379 F.2d 55, 64 (8th Cir. 1967)).

confirmation performance.

A.   Pre-Petition Performance

The Betteroads Group first presented historical data demonstrating operating losses for the four year period immediately preceding the Debtors' bankruptcy filing.[8] Debtor does not dispute that its operations had been unprofitable from 2008 to 2011.

Up until April 2012, the Debtor owned four asphalt processing plants along with the costs associated to maintain, operate and manage such facilities. Betteroads Group' expert witness testified that Puerto Rico's economy has been undergoing tough times since the local government closed in 2006. Furthermore, the economic situation worsened as a result of the worldwide economic recession. As a result, expenditures in the construction and asphalt industries in Puerto Rico have declined due to increase in construction costs, lack of demand and budget constraints from the public and private sectors.

Debtor's president testified that the operation of multiple plants had become a burden and an unsustainable endeavor due to the dramatic decline in demand. With this in mind, the Debtor devised a plan of reorganization that would adjust to the realities of the current market for asphalt and would be sustainable by revenues from operations. Due to the decline in sales volume, such

---

[7] In re Belco Vending Inc., 67 B.R. 234 (Bankr. D. Mass 1986)(citing (In re Agawam Creative Marketing Associates, 63 Bankr. 612, 619 (Bankr. Mass. 1986)).

[8] Exhibit C shows Debtor's historical performance from 2008 to the end of 2011.

excess capacity in production and the associated costs of operating the plants were not compatible with the Debtor's new model focused on efficiency, lower costs and modest sales estimates.

Historical performance is generally helpful in determining future performance of a company, provided that the operations are generally the same. However, such historic performance cannot be interpreted in a void without further considerations. The Court must necessarily analyze whether the Debtor has implemented measures to break this trend and avoid the same mistakes that led to operating losses and the bankruptcy filing.[9]

In the instant case, the Debtor had been operating four plants prior to the filing of the petition in January, 2012. After the filing of the bankruptcy petition, Debtor reduced its operations by selling two asphalt plants and is currently marketing another plant in hopes of reducing its costs and secured debt even more. Debtor's actions have been consistent with its downsizing strategy to positive results. By addressing the issues that led to its financial troubles, the Debtor is precisely veering away from the unsustainable previous model and pre-petition historical information will not accurately reflect the viability of its enterprise.

---

[9] In re Ridgewood Apartments of DeKalb County Ltd., 183 B.R. 784 (Bankr. S.D. Ohio 1995).

B. <u>Post-Petition Performance</u>

The Betteroads Group then claims that Debtor's post-petition performance has resulted in operating losses. Betteroads Group adds that were it not for the sale of two of the Debtor's asphalt plants, Debtor would have yielded negative income as illustrated in Exhibit D-1.

When Debtor filed its petition it was not operating any of its four plants. With the sale of the plants, Debtor was able to re-launch its business.  We cannot determine feasibility in a vacuum as Betteroads would like us to do.  To ascertain feasibility, we will have to examine Debtor's performance after the sale of asset that provided working capital to its operations.

In this case, the sale of assets has multiple purposes and benefits. It reduced operating costs and wasted production capacity since these plants were not being used. It prevented the depreciation of the assets and maximized their value.[10]  It reduced the amount of secured debt held by Banco Popular by $445,000 to almost half of the amount listed in Debtor's schedules. It reduced the IRS' secured debt by $111,734 to $56,971.  It provided a $200,000 security to MAPFRE for Debtor's possible liabilities in relation to an indemnity agreement.  Finally, it provided the ability to make capital investments necessary for the Debtor to re-

---

[10] Competing bids were considered in the sale of the Toa Alta asphalt plant, thereby maximizing the returns from the sales. <u>See</u> Sales Order on Docket No. 63.

8

launch its operations without incurring in additional financing.[11]

Assets of a debtor's estate that are not necessary for the reorganization process may be sold as necessary to comply with the goals set forth in a Chapter 11 Plan.[12] The Court agrees with the Creditor's argument that the sale of the asphalt plants are non-recurring streams of revenue; however, the reduction of secured debt, operating expenses and other costs, along with the injection of capital increases the possibility that the plan can be funded by its operations. Consequently, the fact that operating revenue will be the main source of funding for the Amended Plan, does not mean that the sale of assets should not be accounted for as a key element of Debtor's reorganization efforts. Even though Debtor operated for only part of the year, it was able to close the year with a positive cash balance and was able to re-stock inventory and begin to operate under its new business model.

C. Post-Confirmation Projections

Betteroads Group also presented its own analysis of the Debtor's future performance of sales, projected cash flow statements and forecasts.[13] They allege that Debtor's projections

---

[11] Prior to the date sale of the Toa Alta plant, the Debtor was not operating. Debtor was allowed to retain $173,265.52 from the proceeds of the sale of the Toa Alta asphalt plant and $50,000 of the proceeds from the sale of the Hatillo plant to purchase raw materials needed to re-start its operations (Dockets No. 63 & 197).

[12] Betteroads Group's expert witness, Carrasquillo, acknowledged that selling unnecessary of assets is a valid reorganization goal. (Transcript February 22, 2013 hearing p. 94).

[13] Exhibits E-1, F-1 & E-1.

9

lack credible assumptions that can justify its sales forecasts.

Betteroads Group specifically argues that Debtor's average sales from April to December 2012 are roughly $319,720, which is short of the $506,667 necessary to fund the plan and its expenses. Using this nine month sales average, the Betteroads Group prepared adjusted projections for the five year duration of the Amended Plan. According to Betteroads Group's adjusted projections, Debtor's expectations and operations show a negative cash balance for the next four years of operation and it is not until the fifth year that there is a positive cash balance.

Debtor argues that the Betteroads Group's analysis is skewed to show unrepresentative figures that would necessarily lead to a doomed plan. Debtor explains that it was not until the sale of the Toa Alta plant in April 12, 2012, that it could buy materials and inventory to re-start its previously ceased operations. Debtor alleges that operations started in May 2012 and were fully operational in June 2012. Debtor claims that the months of November and December 2012 were also outlier months, which are not representative of Debtors' operations, since November was an election month and like in December several holidays were observed. Debtor urges the Court to examine what it considers to be the representative months of the operations that demonstrate a positive cash balance and that Debtor will be able to meet its obligations

under the Amended Plan.

Upon review of Debtor's monthly operating reports, the Court finds that the most representative months are June to October 2012 that reflect average monthly sales of $489,658.01. It has been accepted by both the Debtor and the Betteroads Group that January, February, March and November of 2012 are outlier months that are not representative of the Debtor's operations. It was also established that with the proceeds obtained with the sale of the Toa Alta asphalt plant in mid-April 2012, Debtor purchased raw materials in order to replenish its inventory and re-start operations. Debtor argued that operations started in May 2012 and it was not until June that operations were at its desired capacity. As for December 2012, Betteroads Group did not challenge Debtor's assertion that December was also an outlier month.[14]

Debtor's numbers when operating at the desired level can yield the expected results or close enough to consider as a realistic and reasonable assumption. This monthly sales goal, which is conservative, can be reached by selling an average of 5,000 tons of asphalt at an average price of $100 which would represent 27% of the production capacity of the plant.

---

[14] The Betteroads Group presented the Monthly Operating Report for the Month of December, Exhibit M, in its entirety without objecting to any of its contents. The last page of Exhibit M includes the following statement: Due to extraordinary circumstances of the months of November and December, 2012, (Elections, change in administration, uncertainty of pending jobs related to public projects and the Holidays) these two months are not and will not be representative of Debtor's operations post petition.

11

Betteroads Group's expert witness analysis is limited to sales projections. However, we cannot determine feasibility on this criteria alone. Debtor has other available funding sources such as the collection of accounts receivable and the sale of the Guayama asphalt plant which should render the necessary amount to comply with plan payments. As of December 31, 2012, Debtor had an accounts receivable balance of $2,272,186.30 of which $2,115,794.59 are over sixty days old and $156,461.71 are under 60 days old.[15]  According to Debtor's operating reports, 40% of accounts receivables that are over 60 days old are expected to be collected and accounts receivable under 60 days old are expected to be collected in their entirety. Therefore, Debtor has over $1,000,000 worth of cash collectibles that can provide extra support to its operating revenue to fulfill its obligations and to make capital investments to improve efficiency and/or yield additional revenue for the benefit of the corporation.[16]

The [feasibility] test "does not require proof that the economic projections is certain...The requirement is to prevent confirmation of visionary schemes.  The Court must find that the financial projections [that] support a plan of reorganization are derived from realistic and reasonable assumptions which are capable

---

[15] Debtor's December Monthly Operating Report, p.4, Docket No. 295 and Exhibit M.
[16] Accounts over 60 days total $2,115,794.59; 40% of these receivables equal $846,318, plus $156,461.71 from receivables under 60 days equals $1,002,779,

of being met".[17]    In cases such as our present case "where a debtor proposes to fund a plan out of operating revenue, its financial record during the pendency of the Chapter 11 is probative of feasibility. Income projections indicating financial progress must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic predictions".[18]

Another factor that must be considered regarding Debtor's ability to meet desired results is two recent purchase orders for 10,000 tons of asphalt and for 8,000 tons of asphalt from late December 2012 and early January 2013.[19]  Considering that the Debtor's plan is aiming for an average of 5,000 tons of monthly asphalt sales, such purchase orders would represent funding for the plan for three months.[20]  In evaluating the legitimacy of the purchase orders, the Court considered that these types of orders are the common method of securing a purchase price and delivery

which is the total expected accounts receivables to be collected by the Debtor.

[17] In re Leominster Materials Corporation, 2005 Bankr. LEXIS 2464 (Bankr. D. Mass. 2005)(citing In re Ridgewood Apartments of DeKalb County, Ltd., 183 B.R. 789 (Bankr. S.D. Ohio 1985)).
[18] Belco, 67 B.R. 234(citing In re Merrimack Valley Oil Co.,32 B.R. at 488).
[19] Debtor's Exhibits No. 3 & 4.
[20] Although the purchase orders considered were for less than the sought after average purchase price of one hundred dollars ($100) per ton of asphalt, the total sales revenue would be enough to cover three month's worth of operations costs and plan payments.  (Average monthly sales $506,667 x 3 months = $1,520,001.  10,000 tons x $80 = $800,000.  8,000 tons x $86 = $688,000.  Total revenue from purchase orders $1,488,000.  The price of asphalt in the purchase orders was discounted by 7% to account for sales tax which was included in the quoted price.  See Transcript of hearing held on February 22, 2013, pp.6-21.

13

of goods within the industry.[21] The Court also considered that the purchasing parties are Debtor's regular customers as evidenced by the parties' transactions throughout 2012.

Additionally, Debtor presented as evidence of its good faith efforts to properly reorganize, an eligibility certificate as a bidder for Puerto Rico government projects valid through June 21, 2013.[22] This certificate clears the way for the Debtor to bid for public projects to supplement its business with private contractors. Because Debtor is operating at a capacity of 27%, there is room to increase production in case demand for asphalt increases or new contracts are acquired. Consequently, capital investments should be minimal to increase production and there is potential for increased revenues.

The Betteroads Group further contends that Debtor is administratively insolvent and will be unable to pay administrative expenses upon the effective date of the Amended Plan. They allege that administrative expenses will be higher than the $66,500 estimated in the Amended Disclosure Statement because Debtor's professionals have not submitted their respective applications for compensation. Debtor explained that the administrative expenses included in the Amended Disclosure Statement were estimated as of June 26, 2012. Debtor argues that some of the administrative

---

[21] As testified by Debtor's President, Fernandez and Diaz, on the hearing held on February 22, 2013.

14

expenses contemplated in the Amended Disclosure Statement have been paid as part of the applications already approved by the Court throughout the pendency of this case. At this juncture, the total amount due for professional fees is less than $8,000 and there are no other applications pending approval.[23]

As of December 31, 2012, Debtor had $64,802 cash on hand and over $1,000,000 of collectible accounts receivable; as such, even if the $66,500 estimated for professional fees were considered in its entirety, it would be difficult to conclude that it could not produce the necessary funds to comply with these payments upon the effective date of the Amended Plan.

### IV - CONCLUSION

Debtor has been undoubtedly moving in the right direction since the filing of the petition. It has reevaluated its business model and taken concrete actions to implement more efficient operations. Debtor finished the year with a positive cash balance, an increase in inventory and sales commitments by its clients. Debtor has taken into account the internal and external factors that led it to file for bankruptcy in order to design a feasible plan that it will be able to accomplish. Debtor has complied with its obligations throughout the pendency of the case and has shown improved results congruent with the expectations and forecasts.

---

[22] Exhibit C.
[23] See Transcript February 22, 2013, p.131 and Docket No. 287.

Debtor has complied with § 1129.[24]

Chapter 11 embraces the "two recognized policies [of] preserving going concerns and maximizing property available to satisfy creditors".[25] The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap.[26] Preserving Debtor's viable business would maximize returns for all creditors and it is in the best interest of the creditors and the estate, when compared to an asset liquidation.

---

[24] On the evidentiary hearing held on December 18, 2012, Debtor listed all the requirements of § 1129(a) and explained how the Debtor's plan complied with all of them, excepting the requirements of § 1129(8).

[25] 7-1112 Collier on Bankruptcy P 1112.04 [5][a]; Bank of America Nat' l Trust & Sav. Ass' n v. 203 N. LaSalle Street P' ship, 526 U.S. 434, 435, 119 S. Ct. 1411, 1413, 143 L. Ed. 2d 607 (1999) ; see G. Eric Brunstad, Jr. & Mike Sigal, Competitive Choice Theory and the Broader Implications of the Supreme Court's Analysis in Bank of America v. 203 North LaSalle Street Partnership, 54 Bus. Law. 1475, 1483 (1999) (discussing the purposes of chapter 11).

[26] 7-1112 Collier on Bankruptcy P 1112.04 [5][a]; H. Rep. No. 595, 95th Cong. 1st Sess. 220 (1977), reprinted in App. Pt. 4(d)(I) infra; See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 527, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984) ("the policy of Chapter 11 is to permit successful rehabilitation of debtors"); United States v. Whiting Pools, Inc., 462 U.S. 198, 203, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983) ("Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if sold for scrap."); Casse v. Key Bank Nat'l Ass'n, 198 F.3d 327, 334 (2d Cir. 1999) ("11 U.S.C. § 1112(b) forms a part of Chapter 11, whose object is to permit a potentially viable debtor to restructure and emerge from bankruptcy protection") (internal quotation marks omitted); Arkansas, Inc. v. United States Trustee (In re Camden Ordnance Mfg. Co. of Arkansas, Inc.), 245 B.R. 794, 799 (E.D. Pa. 2000) (citing Treatise), aff'd, 245 B.R. 794 (E.D. Pa. 2000) ; In re Great Am. Pyramid Joint Venture, 144 B.R. 780, 788 (Bankr. W.D. Tenn. 1992).

No reorganization plan is infallible, however, "success need not be guaranteed".[27]

After carefully scrutinizing Debtor's Amended Plan and the objections thereto, the Court finds that the Plan sets the forth realistic and attainable goals and it is not part of a visionary scheme to take advantage of the reorganization process. Management has taken the necessary measures to implement its new business strategy and is capable of performing its duties under the Amended Plan.

For the reasons stated herein, the Court denies Betteroads Group's Objection to Confirmation and Request for Conversion. The Court confirms Debtor's Amended Plan of Reorganization.

SO ORDERED.

San Juan, Puerto Rico, this 11 day of March, 2013.

Mildred Caban Flores

U.S. Bankruptcy Judge

---

[27] Monnier, 755 F.2d at 1341.

17